IN RE ASSESSMENT OF TAXES OF H. HACKFELD &
    COMPANY, LIMITED, APPEAL BY THE ASSES-
    SOR FROM TAX APPEAL COURT, FIRST TAXA-
    TION DIVISION.

IN RE ASSESSMENT OF TAXES OF C. BREWER &
    COMPANY, LIMITED, APPEAL BY THE ASSES-
    SOR FROM TAX APPEAL COURT, FIRST TAXA-
    TION DIVISION.

IN RE ASSESSMENT OF TAXES OF CASTLE &
    COOKE, LIMITED, APPEAL BY THE ASSESSOR
    FROM TAX APPEAL COURT, FIRST TAXATION
    DIVISION.

IN RE ASSESSMENT OF TAXES OF W. G. IRWIN &
    COMPANY, LIMITED, APPEAL BY THE ASSES-
    SOR FROM TAX APPEAL COURT, FIRST TAXA-
    TION DIVISION.

IN RE ASSESSMENT OF TAXES OF ALEXANDER &
    BALDWIN, LIMITED, APPEAL BY THE ASSES-
    SOR FROM TAX APPEAL COURT, FIRST TAXA-
    TION DIVISION.

IN RE ASSESSMENT OF TAXES OF THEO. H. DAVIES
    & COMPANY, LIMITED, APPEAL BY THE ASSES-
    SOR FROM TAX APPEAL COURT, FIRST TAXA-
    TION DIVISION.

# IN RE ASSESSMENT OF TAXES OF F. A. SCHAEFER & COMPANY, APPEAL BY THE ASSESSOR FROM TAX APPEAL COURT, FIRST TAXATION DIVISION.

ARGUED MARCH 15, 1905.          DECIDED MARCH 30, 1905.

FREAR, C.J., HARTWELL, J., AND CIRCUIT JUDGE DE BOLT IN PLACE OF WILDER, J.

TAXES—*plantation agency contracts.*

> Plantation agency contracts, as held in *C. Brewer & Company's* case, 15, Haw. 36, are taxable by statute. They also have cash values which can be appraised after ascertaining the plantations' condition and prospects and considering probable cost of production and price of sugar, being a similar estimate to that which a purchaser of sugar stocks makes in determining what he will pay for them.

## STATEMENT OF THE CASES.

These are appeals by the tax assessor from the tax appeal court involving the assessor's valuation of plantation agency contracts. Some of the contracts are written, having definite terms, others are oral without definite date for termination. The tax appeal court held that although under the decision in *Assessor v. C. Brewer & Co.,* 15 Haw. 36, the contracts are taxable within the meaning of the statute, they have under that decision no cash value when terminable at will or having a term of not more than one year. The court in its decision declared that it could find in the evidence or the law no basis for determining a cash value of any of the contracts; that the evidence showed that "the agents holding contracts with the sugar companies, invariably either themselves, or with their employees or officers, or friends, hold a majority control of the stock of the sugar company, and the contracts are unquestionably of value to the agents holding them;" but "have never been bought or sold in this market, therefore no previous sales of contracts can be used for establishing values;" that

although Brewer & Company returned certain contracts at a valuation, other agencies assigned no cash value to them; that "the return of one contract, and particularly where such contract was coupled with control of plantation stock, could not serve to fix the value of the naked contract stripped of control of stock and incidental advantage in case of some other agency;" that "those contracts containing provisions such that they can be terminated by a year's notice, from either party, are to a large degree perpetual contracts, for those interested are officers, directors and stockholders in both companies to the agreement, and therefore so interwoven with one another that it would be almost impossible to dispose of the contract alone, without a transfer of the control of the stock;" that "it is difficult to imagine one of these agency contracts standing by itself, where the agency holding the contract has no direct interest in the plantation, nor have any of the agent's own stockholders or friends any direct interest in said plantation, in which case the control of the plantation would be in the hands of rivals of, or opponents to, the agent holding the contract;" or that "an agency contract under conditions above outlined has much of a market value, if any."

The assessor valued the contracts by taking the plantation estimate of their crops for 1904, deducting twenty per cent. for unforseen contingencies, reckoning the proceeds at $70 a ton and the agents' commissions at 1 1-2 per cent. on sales. From these receipts he deducted fifty per cent. for estimated expenses in connection with the contract and then assessed each contract at four tims such net commissions, regarding all the contracts as four year contracts, all of the agents but Castle & Cooke having refused to allow him to see their contracts or to give any information about them.

A. G. M. Robertson for the assessor: "There is practically but one question to be decided, and that is, the full cash value of each contract. That each one of these contracts is a contract within the meaning of the tax law and subject to be taxed at its full cash value was held in 15 Haw. 29, 36, where it is

said 'these agreements whether written or verbal and whether for a definite period or terminable at will are certainly all 'contracts' within the meaning of section 819. The court did go on to say that 'those terminable at will as also that with the Ookala Sugar Company for a term of one year only, have of themselves no cash value—nothing could be realized upon an attempted sale of a privilege to act as agent, which privilege carried with it no assurance of its continuance for a definite length of time.' The point that the supreme court passed on, and all that it could pass on, was whether as shown by the evidence in that case, those particular contracts had any cash value, and if so what it was. The cash value of a piece of property is a question of fact and not a question of law. If it appears from the evidence in these cases at bar that contracts similar in terms to those in the *Brewer* case have a cash value, then it is the clear duty of this court to ascertain that value. The record in these cases shows that what might be called terminable at will contracts have, perhapst not in theory, but certainly in practice, as much value as contracts for definite terms, and that any evidence tending to show a cash value of any one kind of a contract shows a cash value of any other kind. Every contract has been definitely assessed a certain amount. The evidence shows in the case of each contract what was the actual income derived therefrom, and what were the expenses in connection therewith. The length of the unexpired term of each contract has been shown. * * * Other facts have also been shown in the case of each contract, namely, the amount of sugar produced in the past by the plantation and the probability and the uncertainty as to the amount to be produced hereafter, the cost of production, past and future, the amount of the advances requisite, the obligation to make those advances when needed and to procure the money for that purpose, and the continued credit of the agents at home and abroad. These are all elements suggested by the court in the *Brewer* case, 15 Haw. 37, that should be considered. And from all these facts there should be no difficulty in ascertaining with definiteness the

value of any particular contract. We strongly contend that justice will not be accomplished by regarding these contracts as of no value. That these contracts have value is shown by the opinions of the tax-payers themselves. Irwin, one of the most candid of the witnesses, stated in substance that the Paauhau contract had no cash value because it was not transferable and was not classed as an asset. Then he was asked the following question: 'Assuming that this were an assignable contract, what would you consider the value of such a contract if it were assignable?' to which he replied: 'I suppose the amount set forth in that table is a fair value, showing in the neighborhood of $5,000, and expenses fifty per cent., $2,500 a year.' * *

* Bowen, of Castle & Cooke, Ltd., referring to the Ewa contract which is held by it, said: 'We desire to retain the contract for the business furnished,' and that such a contract was valuable to them. Bishop, of C. Brewer & Co., testified that the agency business was valuable. In addition to this Hackfeld & Co. return a value of some of their contracts and Brewer & Co. of some of theirs.

"Attention is called to the fact that in no case is less than 1 1-2 per cent. charged for commissions, and sometimes it is as high as four per cent. In no case has the assessor allowed for any commissions for purchases outside of the Territory, although in every case there has been some charged. In no case has the assessor allowed for any of the indirect benefits derived from the contracts, which undoubtedly increase the value, such as profit from sales of merchandise to the plantation by the agent, placing insurance of plantation property in companies contributing to the agent, receiving the benefit of exchange, getting a rake-off from steamship lines carrying the sugars from the Territory to the mainland, etc. A striking example of what these indirect benefits are is found in the case of the Oahu Sugar Co. contract held by Hackfeld & Co. In that case the plantation keeps a plantation store at Waipahu. This store is stocked up mainly with goods from Hackfeld & Co. merchandise department, and the profits from such sales from Hackfeld & Co. merchandise department, which gets the privilege in practice, if not in theory, of being first to sell by reason of the contract held by the Hackfeld & Co. agency

department, goes into what may be called Hackfeld & Co. profit department.'

Taking up the contracts of each tax-payer, Alexander & Baldwin, Ltd., have six contracts returned at nothing and assessed at $111,831.32. All its contracts except Kihei are for one year from May 1, 1903, and thereafter until one year from date of receipt of notice of termination by either party. The agent receives two per cent. on gross sales of sugar and 2 1-2 per cent. on purchases of merchandise outside of the Territory; six per cent. interest on advances and pays interest on credit balances at only three per cent.; and also receives shipping commissions. Its Kihei contract is for fifteen years from October 31, 1899. Tonnage, 1,374 tons in 1901, and 5,629 in 1903. "It is admitted that the agent received out of these contracts during 1903 the sum of $27,957.83. It would not be far wrong to say that directly and indirectly the agent received during 1903 by virtue of these contracts over $75,000."

Castle & Cooke, Ltd., has five contracts returned at nothing and assessed at $97,662.60. Two of its contracts, Ewa and Waialua, are for fifteen years from October 1, 1898, the agent receiving 1 1-2 per cent. net on sugar sales and commissions on purchases elsewhere, also benefit of exchange. The plantations get no interest on credit balances. Its contract with Apokaa, a small plantation, calls for 1 1-2 per cent. commissions on gross sales; the contracts with Kohala Sugar Co. and Waimea, 2 1-2 per cent. "In referring to these Castle & Cooke contracts it appeared that during 1903 it made $43,-113.78 in addition to actual commissions on sugar sales. This just shows how valuable these contracts are. Take away the contracts and you not only take away the actual commissions received by them, but also this extra amount of over $40,000 which is received by virtue of the contracts. The assessment against Castle & Cooke is clearly justifiable."

Hackfeld & Co., Ltd., has nine contracts, "four of which were apparently returned at $40,445.52, and all of which were

assessed at $110,615.40. The tax-payer took the four written contracts it has and figured the net yearly profit for 1903 on them which amounted to the return. If that was the proper method of finding the value then the other five should have been valued in the same manner. But clearly a contract which has, say, ten years to run, certainly has a cash value of more than one year's net profit from the same." Its contracts with Oahu Sugar Co., Pioneer Mill, Kekaha and Koloa are respectively for twelve years from April 1, 1897, fifteen years from October 1, 1898, fifteen years from October 1, 1899 and fifteen years from January 1, 1902, allowing 1 1-2 per cent. net on sugar sales, benefit of exchange and exclusive right to purchases or procuring of machinery and supplies for the plantation, free of commissions, but allowing the agent the profits made in such purchases and sales. Its remaining contracts, namely, Lihue, Kukaiau, Hawaii Mill, Kipahulu and Grove Farm, although from year to year, have been running along for about twenty years, except Hawaii Mill, five years.

W. G. Irwin & Co., Ltd., has eight contracts, two in writing, the others oral. Its Paauhau and Kilauea are for ten years from March 2, 1899. Its Hakalau, Hilo Sugar Co., Hutchinson Sugar Co., Honolulu Plantation, Olowalu and Waimanalo contracts have been running for many years, all these plantations showing large net profits in 1903. This is true of every one of the agency contracts of all of the taxpayers in the present cases.

C. Brewer & Co., Ltd., has five contracts, one in writing; Onomea for twelve years from July 1, 1899, which was returned for $8,308.40. All of these contracts were assessed at $65,463.32. Its Onomea and Ookala contracts require 2 1-2 per cent. commissions. Its remaining contracts with Wailuku, Honomu, Hawaiian Agricultural Co. show substantial profits.

T. H. Davies & Co., Ltd., has eight contracts assessed at $56,895.32. Its return was made of $120 without explanation. Its McBryde contract is for fifteen years from 1899. The agent received in 1903 $16,000 commissions from sugar

sales and about $1,000 from purchases. "The other planta-
tions for which Davies are agents, namely, Laupahoehoe, Pepe-
ekeo, Waiakea, Union Mill, Niulii, Hamakua Mill and Pua-
kea, have no written contracts with their agents, except Pua-
kea, which is a very small plantation and from which the agent
received in 1903 the sum of $610 in commissions. There is
not much information in the record about these plantations due
to the fact that the tax-payer failed to furnish it. All of these
contracts are valuable ones. The assessor figured on all of the
contracts of this tax-payer that the agent received a net profit
in 1903 of $14,223.83. What the tax-payer actually receives
is more probably in the neighborhood of four or five times as
much. Property returning such an annual profit has value,
and any one with common sense cannot deny it."

F. A. Schaefer & Co. have two contracts returned at nothing
and assessed at $18,127.20, Honokaa and Pacific Sugar Mill
each for fifteen years from July 1, 1899. "A good deal has
been said about the necessity of maintaining credit by the
agent. The matter is very simple. Any bank will advance
money on the bills of lading for sugar shipped, and all the
sugar has to come to the agent. It is a queer thing, but it
rarely if ever happens that a plantation has a credit balance.
It seems to be the policy of the agents to always keep the plan-
tations in debt. It is almost criminal the way some of the
agency business is conducted. The idea of advancing money
to pay dividends and charging the plantation all the way from
six per cent. to ten per cent. for the advances and then in addi-
tion practically compounding this rate. Then, too, think of an
agent making out of his dealings for his principal a profit
in addition to the stipulated compensation. There is undoubt-
edly a day of reckoning ahead for the agents."

Castle & Withington for Castle & Cooke, Limited: "The
meaning of the word 'contracts' must be interpreted in the
light of the analogous classes of personal property set forth
in the section. The maxim 'noscitur a sociis' applies, and it
includes only contracts which are of the nature of chattel

interests in land and real property, of franchises, of a right to growing crops, and of public stocks and bonds. * * * A recent case held that the word 'contract' should be construed strictly and did not include promissory notes or bills of exchange, checks or accounts receivable. *(Assessor v. Brewer & Co.,* 15 Haw. 29.) It is true this case treats 'agency contracts' as if assessable but this point is clearly dictum and not considered by the court, as the 'agency contracts' were not assessed. * * * The proposed construction would exempt from taxation all those contracts which come within the ordinary purview of the word and leave a contract of a kind which has never been included by legislative or judicial construction within the meaning of the term as applied in tax statutes. * * * To impose taxes on agency contracts and not upon other contracts is in violation of the Fourteenth Amendment. * * * The act should not be construed to include these agency contracts for numerous reasons, chief of which is that no method of valuing them has been provided by the legislature and as was decided in the *Brewer* case they are incapable of a definite valuation. 'Whether a specific right is subject to taxation may depend upon whether it is capable of valuation bearing a definite relation to other things and property or whether the legislature has provided a method for its valuation.' Am. and Eng. Ency. Law, vol. 27, p. 635."

Paid up life insurance policies are not taxable because "the statute must not only provide what property must be taxed, but it must provide methods for the valuation of such property." *State Board v. Holliday,* 150 Ind. 216. A contract of membership in the associated press cannot be taxed as a credit, the court saying: "Can it be contended for a moment that such contract for the personal services of an editor would be subject to taxation? If so, by whom and how could the value of the contract be fixed or determined? If such a contract were taxable, the same rule would embrace all contracts for labor." *Commrs. v. Rocky Mt. News Print. Co.,* 61 Pac. 494. A contract for the purchase of land does not create a debt and is

not "an effect having marketable value." *Perrigo v. Milwaukee,* 92 Wis. 235. The right to a legacy is not taxable. *Chisholm v. Shields,* 67 Ohio 374. A seat in a stock exchange is not taxable, having no marketable value and the statute not previously having been construed as requiring its taxation. *Baltimore v. Johnson,* 96 Md. 737. So 167 N. Y. 1; 103 Cal. 69.

In the case of this tax-payer the evidence is conclusive that there is no way of fixing a market value. There are no such contracts which are assignable that would fix the market value of these contracts if they were assignable. Some agencies have returned this value as the profits for one year, but this contention is untenable if the contracts in themselves have no value. A contract for years is worth more than a contract for one year. Taxing one year's profit is merely increasing the income tax and that upon the gross income. The assessor's plan to "take a gross income arbitrarily, charge up fifty per cent. as expenses and then estimate the value of the contract as four times the net result is obnoxious to every rule of taxation.. The value of these contracts would not be arrived at in this way. Their value for taxation is, as the court has already held in numerous cases, not the value to the agents but their market value, what they would sell for on the market, what someone else would give for them. There is not evidence in these cases that they have any market value, that anyone would give anything for them apart from the personal good will and trust and confidence which are inextricably woven into the contracts; in other words, what is paid for here in the commission is the personal services of the agents thereof, their high credit, their wide knowledge of plantation conditions and of the marketing conditions, their ability to successfully organize, manage and finance the. companies. * * * It would be eminently unjust to charge up to Castle & Cooke, Ltd., as an asset the value of Mr. Tenney and Mr. Bowen as officers of the Ewa Plantation Company. There would be no way of estimating the value, and the value is a personal value which

does not come within the purview of taxation. To tax these contracts on the law, as it stands now, without any provision for valuing them, would lead to an endless complication and endless difficulties."

An oil lease paying one-eighth of the oil as a royalty cannot be taxed as personal property. *Carter v. Tyler*, 45 Va. 806. So a turpentine lease giving the right to take crude turpentine from trees is not an interest in land. *Ashe Co. v. State*, 35 So. 38.

Castle & Cooke, Ltd., has made a full disclosure which shows that its commissions are the lowest charged, 1 1-2 per cent. on the gross or 2 1-2 per cent on the net. It is admitted that in most cases there was fifty per cent. profit, but they show an average profit during the life of these contracts of $7,276.47. "Of course no one would take the contracts at any price if they were not profitable and some profit would be demanded; certainly, the amount shown is very small."

The net profit made "does not take into consideration what it is worth to pledge the credit of Castle & Cooke, Ltd., and to pledge its more than $2,250,000 of assets to raise money to finance these agencies, nor does it take into consideration what would be a fair margin of profit on agency contracts. * * * The contracts of Castle & Cooke, Ltd., are more advantageous to the plantations. There is no limit on the amounts to be advanced; there are no provisions authorizing the furnishing of plantation supplies nor is the plantation restricted by the contract to purchasing from its agents. So far as Castle & Cooke, Ltd., are concerned, the only right wl ..h they acquire which is assured is the right to the commission on sugar. It is incredible that if these contracts had any market value they would not have been estimated by the parties at some value and as an asset. Castle & Cooke., Ltd., so the evidence shows, have counted them as of no value. We think this worthy of serious consideration because it was not done with a view of escaping taxation but was an honest estimate put by the parties on the contracts when an attempt to tax

them was not anticipated. If these contracts are taxable then they are taxable on the ground that they are too favorable to the agents and not favorable enough to the plantation; in other words, that the agents have something from the plantation for which they give no return. There is no evidence in this case that the contracts are not made for a fair consideration, and we submit further in the case of Castle & Cooke, Ltd., that where that consideration is the lowest any contract is made for the presumption is irrefutable that there is no value in the contract which is taxable."

Smith & Lewis for Alexander & Baldwin, Limited: This tax-payer has five agency contracts, namely, Hawaiian Commercial & Sugar Co., Hawaiian Sugar Co., Kahuku Plantation Co., for one year each, Maui Agricultural Co. for two years, Kihei Plantation Co., Ltd., for ten years; except the last all being terminable on a year's notice, making them one year contracts. The *Brewer case,* 15 Haw. 29, decided that such contracts "have of themselves no cash value. Nothing could be realized upon an attempted sale of a privilege to act as agent, which privilege carried with it no assurance of its continuance for a definite length of time." The same ruling applies to the agency contract of the Maui Agricultural Company, since from January 1, 1905, it is terminable on one year's notice, making it "a two years' contract for the year and thereafter a one year's contract. The Maui Agricultural Company is a partnership including besides the Haiku Sugar Co. and Paia Plantation five corporations, each owning one thousand acres of land, and which on January 1, 1904, "had not a stalk of cane on their lands, the plow share had never touched the soil. The company giving the contract is an enterprise which is in the nature of an experiment. The testimony shows that a sum of about $500,000 will necessarily be spent in 1904 to place the company in position to operate. The term of the contract being no longer than two years we urge that the value for taxation purposes is nil."

"As to the Kihei contract the testimony shows that although

the contract is for a period of ten years, the great expense in running the plantation, the trials and experiences of the past, and the heavy overdrafts by the plantation induced the witness on the stand to testify that the agents would have been very pleased on the first of January to turn the agency contracts over to any one who would pay them, the agents, the money they had advanced the plantation."

The tax-payer's exhibit filed herein shows the balances owing after allowing all credits "what value, if any, this contract has. During the year 1902 for the first three months the debit balance showed from $388,742.48 to $453,128.21. The average debit balance for the year 1902 was $228,918.41. For the year 1903 the average debit balance was $176,059.70. At no time did the plantation show a credit balance with its agents. The evidence also showed that the cost of production of sugar on the plantation for the year 1901 was $233.84; for 1902 $66.67 and for 1903 $81.20. With such a showing although the contract runs for a definite term of ten years, it would seem as though for the amount of money involved, the risk, and the high cost of production, that the contract had no value for taxation purposes."

The incidental advantages going with these contracts cannot be considered as an element of their value, the full cash value being the "value for purposes of sale, if the property is salable, and not the value to the owner," or if the contract is non-assignable "the test would be what it would be worth if it were assignable. 'If the contracts under consideration have any value by reason of the ownership by the same company of large portions of the capital stock of the corporation with which the contracts are made, then such value is not taxable to the company because growing out of and due to the ownership of property which, as above seen, cannot be taxed to the company.' 15 Haw. 36-7." Also 15 Haw. 479.

The test laid down by the above cases is "what would the Kihei agency contract sell for in the open market on the first day of January, 1904, and not what it would be worth to the owner." These contracts are not carried on the tax-payer's

books as of any value. They are contracts for services in which the agent earns his commissions for the work done.

Kinney, McClanahan & Cooper for C. Brewer & Company, Ltd., H. Hackfeld & Company, Ltd., W. G. Irwin & Company, Ltd., T. H. Davies & Company, Ltd., and F. A. Schaefer & Company: These tax-payers make the same contention with the others, relying especially upon the *Brewer* case, ante, although claiming that the decision was that such contracts are within the statute but have no cash value, thus disposing of all contracts having not more than a year to run. Contracts for more than one year have no salable value, and in any event the value is no greater than the contract's net earning capacity for one year. "The value of the contracts depends largely, if not entirely, upon the agents' control of the corporation's stock and hence is not taxable." The argument for the assessor ignores "the main essential fact that the value of the contracts depends largely on the agent's control of the stock of the plantation."

"The assessor proceeds by allowing fifty per cent. of the gross earning capacity of the contract as expenses actually incurred. He then says he will be liberal and fix a value on the contract equal to a sum which would realize twenty-five per cent. as a matter of investment; he finds that the net earning capacity of the contract is $500, the necessary sum which, if invested at twenty-five per cent. to produce $500 would be $2,000, which he fixes as the basis of the value of the contract for taxation purposes. We point out the fallacy of the assessor's methods as follows:

"The contract being intangible in its nature has no value except its earning capacity, and cannot be placed in the same category as real and personal property which have an intrinsic value, which is fixed either by its use to the owner or its earning capacity.

"Our contract is good for four years. Its total net earning capacity for those years is $2,000, and granted for the moment that a man would pay in the market (setting aside the question of interest on investment) $2,000 for such a contract, does that make him liable for a tax upon such contract at the rate of $2,000 for each of the four years, or a total tax payment

of $80? The response to this may be that there would be a diminishing value in the contract as each year goes by. This looks plausible but it is not sound if the assessor has been correct in his first stand in fixing the value of the contract *as property.* Taxes are not assessed and collected for the future, but the method adopted by the assessor in these cases is an assessment of the contract on the basis that the value of the contract for the entire term is consolidated and made liable for the tax of the present year. In other words, the future has been discounted. \* \* \* The contract makes a net earning of $500 for the first year and is valued accordingly, and a tax of $5 is paid, and so through the succeeding years until the contract expires, at which time it has no further value. In this way the total tax collected has been $20 or one per cent. upon the valuation of $2,000 which is the maximum value that could be claimed for the contract. Under the process suggested by the assessor, the tax-payer would pay one per cent. upon the full value of the contract for the current year, and a further tax each succeeding year, which would be a direct and absolute violation of the law for the collection of taxes. This same rule would apply to contracts having a longer term than four years. *The government is not entitled to collect any greater sum than one per cent. upon the total value of the contract for its entire term, such sum to be equally distributed through the years comprising said term.*

"What we claim is, that these contracts to have a value for taxation purposes must have a definite unexpired term of more than one year, and that the value in such case, if anything, is the earning capacity of such contract for each year of the term less the expense incurred in maintaining the same, and the worth of the personal service rendered by the agent under the contract."

Take a building contract, for instance, "no man would bid for such a contract more than the net value after deducting cost of labor and materials, and a reasonable percentage for his time and skill, so with the agency contract there should be an allowance for the personal skill, credit and service of the agent."

"The income producing capacity of the contract cannot be fixed by mere conjecture or presumption." The uncertainty of crops and sugar prices and the necessity to maintain credit

abroad are to be considered. Tangible property earns a certain amount each year, its owner having both the earnings and the property, "but intangible property such as an agency contract has only its earning capacity and nothing more." An agency contract can only be assessed once at its value.

In Irwin's contracts it is admitted that the gross commissions received are correctly stated by the assessor, and that fifty per cent. for expenses was correctly estimated by him. Their contracts are all at will, except two, with unexpired terms of about five years each. Irwin testified that $2,500 was a fair value for the Paauhau contract. On the same basis the Kilauea contract would be worth about $1,450. Brewers have no contracts except with Onomea, from which they had $17,882.48 commissions, the value of which contract they returned at $8,308.48. Hackfeld had contracts only with Oahu Sugar, Pioneer, Kekaha and Koloa. The return of their value made by it of $40,445.52 was liberal. There is no other evidence upon this subject before the court in those cases. Davies had no contracts except with McBryde and Puakea. The former has no value, for the contract if sold would carry an obligation of advancing $990,000. No purchaser could be found for it. It has no market value. Puakea receipts were $610 and the contract has no commercial value. The agency of all the other plantations is terminable at will, resulting from majority ownership. Schaefer had contracts with Honokaa and Pacific Mill only; no value to them, owing to the great risk in conducting their business.

### OPINION OF THE COURT BY HARTWELL, J.

Are the agency contracts taxable? The statute includes contracts in its classification of taxable things. In order to hold that these contracts are not taxable a distinction based upon some principle must be made between taxable and nontaxable contracts. It is not enough to exempt a contract from taxation that it is intangible, for that is the nature of all contracts; nor that the contract is secured by reason of influential

relations; or in consideration of reliance placed in the ability, experience and good judgment and the difficult nature of the service of those to whom the contract is awarded. Such considerations may always exist, and it is not too much to say that except in cases of sinecures they always ought to be the basis of contracts. The uncertainty or length of time of the contract may affect its value, but it would be illogical that one who has the benefit of a contract for five years shall be taxed therefor and that the holder of a contract for one year shall not be taxed. It is true that ownership of a majority of the stock of an incorporated sugar plantation carries with it the power to secure contracts for the agency of the plantation, but this is not an incident of ownership of the stock in the same sense that receipt of dividends is a proprietary right. If the majority shareholders were to appoint, as they might do, an agent other than themselves and give him the contract, there would be no stronger or other reason for taxing such person for the value of his contract than when they give the contract to themselves rather than a third person. Moreover, if it were true that obtaining an agency contract is an incident of owning a majority of the stock, that does not detract from the value or taxability of the contract any more than from the money received from dividends as a result of owning stock. But it is claimed that the contracts require in some instances heavy advances of money to be made by the agents, who undertake great risks thereby, resulting, perhaps, in large losses and that at any time large loss may result from such causes as fall in prices, shortage of labor or failure of the crop. But it is to be presumed as a rule that the security for advances is sufficient, or the risk would not have been taken.

Castle & Cooke show that their agency profits generally for their various plantations netted them an average annual profit of $7,276.47, owing to unfortunate conditions in respect of certain plantations. This would be a reason for a lower valuation of the contract for such plantations, but would not justify

the conclusion that the agencies of other plantations were of less value than their results showed.

It is said that the contracts are of value solely to those who hold them and have no salable or market value because the holders either do. not wish to sell or have no right to do so; but it is seldom that contracts are assignable like negotiable paper. Their non-assignability does not exempt them from taxation.

Further it is claimed that the test value for taxation purposes is not the value to the owners, but the market value. This is sometimes true, as for instance, the owner of an heirloom may attach value to it entirely apart from its intrinsic value and which would be utterly inappropriate as a basis for assessing taxes; but it cannot be said of things having an actual, real and estimable value to their owners, which is a value per se and intrinsic, that they have no market value.

Contracts which secure to their holders many thousands of dollars in a year as agents of sugar plantations have actual, intrinsic value, which cannot be eliminated because the holders of the contracts will not or cannot part with them, or have obtained them in consequence of personal or business relations, or of ownership of a controlling interest in the plantations, or because in return for such compensation they give an equivalent service.

The statute in mentioning contracts as taxable makes no exception of agency contracts obtained as these are obtained, but applies in every such instance. In the *Brewer* case, 15 Haw. 29, it was held that contracts for the agency of the Onomea and Ookala Sugar Companies were within the meaning of the statute, but that on the evidence adduced in that case no valuation could be attached to them. Upon the evidence adduced in these cases we cannot say that value cannot be attached to them. To say that they are valueless requires one to lay aside conceptions of value in its ordinary and usually understood meaning. One could as easily estimate the value of a contract as the value of stock. It is true that there are many

things of great pecuniary value which are incapable of definite valuation for purposes of taxation or for any other purpose, as for instance, influence, power, opportunity, experience, integrity, tactfulness, good judgment, acquaintance, the value of which is inestimable, and none of which *per se* would be taxable. It would be grotesque to speak of the possessor of such qualities or qualifications as taxable for them; but a contract obtained by reason thereof, or as a consequence and by the exercise of such desirable and advantageous qualities or opportunities is none the less therefor a taxable contract.

What then is the value of these contracts? Is it not what their holders get out of them less what they expend in executing them? All contracts are in the absence of evidence to the contrary presumed to be based on a sufficient and legal consideration, a *quid pro quo*. The plantations obtain from their agents the benefit of their services, their best judgment, their attention to the affairs entrusted to their charge, and it is to be presumed that for these benefits full, adequate compensation is made. Surely the contracts are not valueless because the agents earn and deserve all they receive for performing them. This does not mean that one may not make a contract by which he has bound himself to do things which entail not gain to himself but loss. The contracts in question are not of that kind. On the contrary they bring and are meant to bring definite important and direct pecuniary gains to the agents who hold them. They are assets of great value, so recognized by all persons familiar with the business houses who hold them. These values are very tangible things, and the way it comes to pass that the contracts are obtained is immaterial.

It is claimed that on the rule *noscitur a sociis* the contracts meant by the tax law must be construed to mean something like the other things therein named, as for instance, chattel interests; but the word "contracts" was introduced in 1886 into the earlier statute and evidently was meant to include somehing different from and in addition to the things previously enumerated.

As to the claim made by one of the tax-payers that the Fourteenth Amendment requiring equal protection of the laws does not permit the taxation of the contracts in question, and also that their taxation would amount to double taxation, namely, one under the income tax law and the other under the law treating the contracts as a species of property, "double or duplicate taxation may be enforced by a state or may result from the operation of the tax laws of a state without violating the constitutional guaranty of due process of law. It has been repeatedly recognized that duplicate taxation, to a certain extent, cannot be avoided in state tax systems. Thus may be taxed both property and the money that is paid for the property; land and the mortgage upon the land; property and the income from the property. * * * Assuming that there is no discrimination as between the tax-payer in the same class, the power of the state to tax twice is said to be the same as the power to tax once, that is, no consitutional question is raised by the exercise of that power." Judson on Taxation, Sec. 426.

"It is said that the plaintiff's property had previously been assessed for the same purpose, and the assessment paid. If this be meant to deny the right of the state to tax or assess property twice for the same purpose, we know of no provision in the Federal Constitution which forbids this." Per Miller, J., in *Davidson v. New Orleans,* 96 U. S. 106.

"It is not every indirect duplication of a tax which constitutes double taxation. If the duplication be only an incident of the tax it is not double taxation in the sense of the requirement that equality and uniformity must be preserved." 1 Cooley on Taxation, 3d Ed., 389, note 1, citing *S. Nashville St. R. Co. v. Morrow,* 3 Pickle 406.

Another objection made to taxing the contracts is the uncertainty of their duration, making it impossible, as it is claimed, to attach value to them in any case not for more than one year. There appears to be practically a certainty of renewal of these contracts from year to year, but the correct method of valuing yearly contracts is to take their cash value for one year only. The cash value of such contracts, as well as of longer term contracts, could easily be appraised by persons qualified to hold

them, after ascertainment of the conditions and prospects of the plantation and a consideration of the probable cost of production and price of sugar. This is the estimate that every purchaser of sugar stocks makes in determining what he will pay for them.

Upon the whole we think that while for various reasons it may not be true that every species and form of contract is taxable, these contracts have such a distinctive, established and valuable nature that they cannot be eliminated from the statute, and that their reasonably approximate cash value may be ascertained. Various methods of ascertaining a cash value for time contrcts would be appropriate. One method would be to ascertain the present worth of the yearly profit for a term of years, which of course, would decrease in amount with a lapse of each year of such term, and to make allowances for any special features that might exist. By applying such method of valuation, omitting from the calculation all incidental profits, considering solely those arising from commissions on sales, we consider that the assessor's valuation was not too high in respect of H. Hackfeld & Co., Ltd., ($110,615.40); of Castle & Cooke, Ltd., ($97,662.60); and of F. A. Schaefer & Co., ($18,127.20). In those instances the method of valuing by obtaining the present worth of estimated annual profits for a term of years would bring the assessor's valuations well within results so reached, and we sustain those valuations. For various considerations presented in the cases, for instance, in respect of the McBryde contract of Theo. H. Davies & Co., Ltd., to which we attach no value, we reduce the assessor's valuations as follows: C. Brewer & Co., Ltd., to $40,000; W. G. Irwin & Co., Ltd., to $40,000; Alexander & Baldwin, Ltd., to $35,000; Theo. H. Davies & Co., Ltd., to $15,000.

The decisions of the tax appeal court are reversed and the assessor's valuations are sustained in the instances above mentioned and are reduced as above stated.